EARNEST SEWELL V. THE STATE.

No. 2644.  Decided March 4, 1914.

Rehearing denied April 15, 1914.

### 1.—Murder—Sufficiency of the Evidence—Accomplice—Corroboration.

Where, upon trial of murder, the evidence was sufficient to sustain a conviction and the testimony of the accomplices sufficiently corroborated, there was no reversible error.

### 2.—Same—Functions of the Jury.

Our law expressly provides that the jury in all cases are the exclusive judges of the facts proved and of the weight to be given to the testimony, and this court can not take the question of fact from the jury, and where the evidence is sufficient to sustain the conviction, the same will not be disturbed. Following Cain v. State, 68 Texas Crim. Rep., 507, 153 S. W. Rep., 147, and other cases.

Appeal from the District Court of Walker.  Tried below before the Hon. S. W. Dean.

Appeal from a conviction of murder in the first degree; penalty, imprisonment in the penitentiary for life.

The opinion states the case.

*J. V. Lea* and *R. H. Holland,* for appellant.—On question of insufficiency of the evidence: Newman v. State, 55 Texas Crim. Rep., 273, 116 S. W. Rep., 577; Branch Crim. Law, sec. 319.

*C. E. Lane,* Assistant Attorney General, for the State.

PRENDERGAST, PRESIDING JUDGE.—The grand jury of San Jacinto County on November 1, 1911, returned an indictment against appellant for the murder of Charlie Davidson, alleged to have been committed on October 29, 1911, in said county.  Soon thereafter the appellant was tried in the District Court of said county, convicted and the death penalty assessed against him.  An appeal was taken from that trial to this court and that judgment was reversed and the cause remanded.  It is reported in 67 Texas Crim. Rep., 105, 148 S. W. Rep., 569.  When the case again reached the District Court of·San Jacinto County, the court changed the venue to Trinity County and still later, when the case was reached in Trinity County the venue was again changed from that to Walker County, in which latter county this trial occurred at the March term, 1913, resulting in the conviction again of appellant of murder in the first degree with the life penalty in the penitentiary assessed.

In this latter trial everything, that was held by this court as error in the first trial, was fully met and cured.  No complaint that was then made is now made as to the conduct of the trial.  In this trial the court in a full, apt and complete charge, charged on murder in the first and second degree, negligent homicide in both degrees, and accidental homi-

cide. Appellant, neither in the lower court, nor in this, complains of the charge of the court in any particular whatever. The only complaint in this trial, in both the lower and this court, by appellant, is that the evidence is insufficient to sustain the conviction, and, within that, that the accomplices' testimony is not sufficiently corroborated.

The report of the case on the first appeal sufficiently states the issues between the State and appellant. They were, on the part of the State, premeditated, deliberate murder which was of the first degree; that of appellant was negligent and accidental homicide. As stated above, all these issues were clearly, fully and aptly submitted by the court in a charge to which there is no objection and the jury found in favor of the State and against appellant's contention.

We have carefully considered the whole record, the evidence, and appellant's brief and, after mature consideration, have reached the conclusion that the evidence was amply sufficient to sustain the conviction and that the accomplices' testimony was amply corroborated. The appellant was tried by a fair and impartial jury, before a fair, learned and impartial judge and away from and in another county from that in which the killing occurred, some eighteen months after the killing. The lower court and jury heard all the testimony, saw the witnesses, heard them testify, observed their manner of testifying, the able presentation and representation of appellant in his case by learned and able counsel, and, under the circumstances, this court can not and should not disturb the verdict of the jury.

What this court said in Kearse v. State, 68 Texas Crim. Rep., 633, 151 S. W. Rep., 827, is especially applicable in this case: "There is hardly any contested case that comes to this court but what there are contradictions in the testimony, and frequently a principal witness may contradict himself in material matters. In such cases, when it is contended that the evidence is insufficient to sustain the verdict, this court can not legally take the place of the jury, and determine whether or not it will believe any witness or witnesses, and from all of the testimony, as put down on paper and sent to this court, it would have found a different verdict from that of the jury, and, if so, reverse the case on that account. The only question this court can determine is whether there is sufficient evidence, if believed by the jury, to sustain the conviction. This court passes upon that question as a question of law which is all it can legally do under such circumstances. Our law expressly provides that the jury in all cases are the exclusive judges of the facts proved and of the weight to be given to the testimony. This court therefore can not take that question from the jury without usurping authority that was never given or intended to be given to it. The jury in a felony case is made up of twelve fair, disinterested, impartial, unprejudiced, unbiased, and competent jurors selected from different portions of the county, each one of whom hears all the witnesses, looks them in the face when testifying, observes their manner and the method of their examination by the respective attorneys, then hears the argument

of the attorneys for each side, one side undertaking to break down the testimony of the witnesses and calling attention to every contradiction in the testimony of such witness and the contradiction by others of him, the other explaining such matters, and seeking to sustain such witness, then hear and take with them in their retirement the charge of the court. Then the twelve men discuss and consider in private between themselves all such matters, and, after weighing it all and all the arguments against it and in support of it, come to the conclusion that the testimony of a certain witness, or witnesses, although contradicted and although there are contradictions in the testimony of such witness, that it is true and they believe it. The jury is made up of men of different ages, from young to comparatively old men, and they pursue different occupations and businesses. With all these surroundings they are much more competent to arrive at the truth than are the judges of this court who must look solely to the testimony as written down on paper. It can not portray the manner, the looks, and the deportment of the witness, nor the manner of his examination and cross-examination by the attorneys. Besides this, the presiding judge hears and sees and observes all that the jury does in the trial of the case and he then sustains the verdict of the jury. Therefore, when the evidence taken in its favorable light sustains the verdict, this court can not legally set it aside." Cain v. State, 68 Texas Crim. Rep., 507, 153 S. W. Rep., 147.

It is unnecessary to detail the evidence, or to discuss it. We will merely state what our conclusions on some of the salient features of it, from the State's standpoint, are. From the appellant's standpoint, it would have justified the jury to have found in his favor.

The deceased was a young white man; the appellant, a young negro man. Deceased lived in the town of Shepherd in San Jacinto County and owned, or was interested in a farm some miles therefrom in the direction and perhaps near where appellant lived. On the night he was killed he was going from Shepherd to his said farm in company with appellant and some six or eight other negro men. The appellant and these negro men were in the town of Shepherd during the latter part of the day preceding the killing and most, or all of them, except, perhaps appellant, were heavily drinking, both at Shepherd and on the way to their homes that night. Sometime in the latter part of the evening at Shepherd, or in the night, it is not certain which, the appellant's horse got loose from him and evidently was making his way towards appellant's home. After appellant discovered that his horse had gone, without the knowledge and consent of deceased, he took deceased's horse and rode him, hunting for his own. He did not find his own. After being away some two hours on deceased's horse, he returned to the town of Shepherd. Deceased discovered that his horse had been taken and when appellant returned him, the evidence justified the jury to believe, that he somewhat severely reprimanded him and this incensed appellant. There were two roads leading out of Shepherd towards where all these parties were going that night. The roads came together again in about three

quarters, or one mile from Shepherd. All these parties left Shepherd about the same time. The company divided,—one part of it, the larger number, taking one of these roads, and the appellant and deceased and some others taking the other, the object and purpose of this being that both companies should look for and perhaps find appellant's horse. In leaving Shepherd appellant rode behind his brother-in-law, Robert East-land. Before the two companies got together again where the roads came together, the other company found appellant's horse. It seems that crowd first reached the point where the two roads met and appellant, coming up very soon afterwards, got his horse and got on him. The appellant carried with him from his home that day his .41 caliber six-shooter. After reaching Shepherd, fearing he might be detected by some officer with a six-shooter, he slipped it from a slicker on his saddle and hid it under some building, which building is designated as the justice courtroom, where it stayed from that time till just before he left Shepherd that night. Just before leaving he bought from one of the merchants five cartridges to fit his pistol, and had one of his friends to get for him his said pistol where he had hidden it and carry it for him, which was done. On the road after they left Shepherd that night going towards their homes and when appellant was riding behind his said brother-in-law, appellant told his brother-in-law "if that God damn Charlie David-son fooled with him he was going to kill him." On the road from Shepherd before they reached said point, where the two roads came together again, deceased fired off his six-shooter. There were only two pistols in the crowd,—that of deceased and that of appellant. As soon as all the parties reached where said roads again came together and appellant had gotten his horse, he called for his six-shooter from the friend whom he had to get it and bring it for him, and it was delivered to him. He then at once loaded it with the five shells he had bought at the town. Some of the negroes lit a candle at the junction of said two roads where all the parties stopped and lingered for awhile. Two of the negroes began gambling by the light of this candle. The others, including deceased and appellant, stopped at this point and the deceased there ejected from his pistol the empty shells which he had shortly prior thereto fired off and was reloading his pistol. He was on the ground. Appellant, according to the testimony of the State, after reloading his pistol, immediately and deliberately and willfully, while the deceased's back was to him, shot at the deceased several times, one ball striking him in the back a few inches to the left of the back bone, penetrating the shoulder blade and one of the ribs, and went through the heart, but not through the sac surrounding the heart, which instantly killed the deceased. Three of the negroes who first stopped with the others at the junction of said roads had gone on towards their home and were not present when the killing occurred. As soon as this shooting occurred and deceased fell, one of the negroes went to him and attempted to raise him up, but found that he was killed. He at once gave directions to one of the parties to ride back to the town rapidly, procure a doctor and the partner and half-brother of the de-

ceased and tell them that the deceased's horse had thrown him and broke his neck, or that he was very seriously hurt. To another one, he gave directions to go after the three negroes who had gone on ahead and bring them back. Both messengers at once departed on their missions and went rapidly to execute their orders. According to the theory of the State, immediately after these messengers left, those present, including appellant, concluded that it was best to remove the body from where it was killed where all these parties had stopped and where this gambling had occurred, some distance away further down the road, and that thereupon they picked up and carried the body by actual measurement, 139 steps from where the killing occurred. Shortly afterwards the messenger went to town to get deceased's friends and half-brother, returned with the half-brother and upon approaching the place where the killing occurred and where the body was when he left, saw that it had been removed therefrom and proceeded to the point with the deceased's half-brother to where the body had been carried. The negroes, other than the State's witnesses, all claimed that they did not know at that time or until the next day that the deceased had been shot, but claimed that his horse had stumbled and thrown him and had broken his neck. The body of the deceased was not examined, that night or the next day, with any care. Strange to say, practically no blood issued from the wound and it was not discovered by the deceased's friends and family that he had been shot until he was carried to Livingston and undressed for burial the next day. We think the physical facts demonstrate that appellant's theory and claim that the killing occurred accidentally or negligently was untrue and that the physical facts practically demonstrate that the killing occurred as claimed by the State. The accomplices, who testified were corroborated amply and sufficiently by circumstantial evidence and the physical facts and by some direct and positive testimony. We think the physical facts demonstrate that the shooting of deceased could not have occurred, and did not occur as claimed and testified to by appellant.

As stated above, we merely give an outline of the State's testimony and what the jury were authorized to believe and did believe therefrom.

Under the law and the evidence, as we see and understand it, we have no alternative but must affirm the judgment, which is ordered.

*Affirmed.*